86 W. Holdings LLC v Singh (2026 NY Slip Op 50091(U))

[*1]

86 W. Holdings LLC v Singh

2026 NY Slip Op 50091(U)

Decided on January 28, 2026

Civil Court Of The City Of New York, New York County

Stoller, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on January 28, 2026
Civil Court of the City of New York, New York County

86 West Holdings LLC, Petitioner,

againstHarbinder Singh, et al., Respondents.

Index No. 73483/2016

For Petitioner: Howard Grun
For Respondent: James Fishman

Jack Stoller, J.

86 West Holdings LLC, the petitioner in this proceeding ("Petitioner"), commenced this holdover proceeding against Harbinder Singh, a respondent in this proceeding ("Tenant"), and "John Doe,"[FN1]
another respondent in this proceeding ("Respondent"), seeking possession of 340 West 86th Street, Apt. 6A, New York, New York ("the subject premises") on the allegation that Tenant failed to maintain the subject premises as his primary residence, predicated upon a notice of an intention not to renew Tenant's lease drafted on June 11, 2015. Respondent interposed an answer stating that Tenant had permanently vacated the subject premises, that Respondent was the stepson of Tenant and the son of Vincentine Singh ("Respondent's Mother"), who was also a tenant of the subject premises, and that Respondent is entitled to succession rights. The Court held a trial of this matter on September 19, 2023, October 24, 2023, March 14, 2024, October 30, 2024, October 31, 2024, April 3, 2025, and November 6, 2025 and adjourned the matter for post-trial submissions to January 15, 2026.
The trial record
The petition pleads, and the answer admits, that Tenant and Respondent's Mother had been tenants of the subject premises pursuant to the Rent Stabilization Law.
The Court awarded Petitioner a final judgment against Tenant and Respondent by a decision dated April 30, 2020. The Appellate Term modified that decision by an order reported at 86 W. Corp. v. Singh, 70 Misc 3d 142(A)(App. Term 1st Dept. 2021). The Appellate Term found that Tenant and Respondent's Mother executed a two-year lease commencing on November 1, 2013; that Respondent's Mother died on December 31, 2014; and that Tenant [*2]relocated, although the date was not clear. The Appellate Term also found that issues of fact were not eliminated as to whether Respondent primarily resided with Tenant and Respondent's Mother for two years before their permanent vacatur and also found that there was no dispute that Respondent's Mother primarily resided in the subject premises up until she passed and that Tenant did not renew the lease after Respondent's Mother died.
Howard Brumer ("Petitioner's Vice President") testified on Respondent's case that he has been vice-president of Petitioner since April of 2021; that he was hired by the Dworman family; that Ross Dworman has been a president of Petitioner since he has been involved; that he oversees a property management company by the name of Solstice; that he hires contractors, that he engages sales of apartments; that the apartments he is referring to are at the building in which the subject premises is located ("the Building"); that Petitioner owns seven apartments in the Building; that there were eight apartments when they started but they sold one and one is now in contract to be sold; that he knows a company called "RB", but he does not know if that is "Riverbridge Realty Corp.", but that may be what they call it internally; that he does not know the full name of "RB"; that at one stage "RB" was an asset owned Petitioner; that in May or June of 2021 there was an internal transfer of 100% of Petitioner's shares to an entity called Shorehaven Property, Inc.; that RB Asset owned 100% of the shares of Petitioner as well as other assets; that he is not aware of any other entity that owned any shares of Petitioner; that the estate of Alvin Dworman and Wanda Dworman own the Shorehaven Property Inc.; that Ross Dworman is not a shareholder; that he was not aware of a transfer; that when there are related party transactions these kinds of forms have to be filed even if there is no beneficial change in ownership; that this may have been an internal merger; that Petitioner has always been the owner; that Petitioner has always been the owner; that that they own stock in a corporation that owns all of these assets; that all of these assets were transferred out of RBS; that he does not know why "RB" is not on the ACRIS document rather than Riverbridge, which is on the ACRIS document; that Alvin Dworman was alive in July of 2021; that he has not heard of Global Investors before; that he does not know the relationship between Shorehaven and Global Investors; that there were a bunch of internal transfers; that he knows elsewhere that Petitioner owns the subject premises; that a couple bought the other apartment from Petitioner; that Petitioner was always the owner of the apartments; that he was involved in that sale, which was apartment 8C, which sold earlier in 2023; that Robert Hirsch was the rent-stabilized tenant of apartment 8C; that he knows what Streeteasy is; that he has looked at properties on it; that he has looked at apartments for comparables; that he knows BJ Hoppe, who was his predecessor, although he did not know her title and he has never met her; that she retired; that he does not have personal knowledge of the facts of this case; that he had to make a filing with the Attorney General's office because the subject premises is a condominium; that he does not know the date that the condominium was effective; that he does not know if Petitioner was the sponsor or the successor sponsor of the condominium conversion; and that there have been subsequent amendments since he has been involved.
Petitioner's Vice President testified on cross-examination on Respondent's case that there was one sale made in early 2023 and another one under contract and that Petitioner has been the owner since he has been involved.
Petitioner's Vice President testified on redirect examination on Respondent's case and that he understood that Petitioner's "interests" are the apartments.
Tenant testified that he lives in Massachusetts; that he moved to the United States from [*3]India in 1969 on a student visa; that in 1973 he became a permanent resident; that in 2011 or 2012 he became a citizen; that he has a master's degree in computer engineering; that he is retired; that worked for Reuters; that he retired formally in 2013 or 2014; that he has multiple myeloma, which was diagnosed in 2008; that he was living in the subject premises up to that point; that in 2008 Respondent lived with him; that he first moved into the subject premises in 1977 or 1979 or 1980; that Respondent lived with him when he first moved in; that he was in a relationship with Respondent's Mother; that he was married to Respondent's Mother in 1984 or 1985; that Respondent's Mother was the tenant when he first moved in; that he assumed that her name was on the lease; that Respondent's Mother added his name to the lease after he moved in; that both he Respondent's Mother were listed on the lease; that he and Respondent's Mother signed the leases; that he may have given authority to someone else to sign the leases at some point; and that he and Respondent's Mother signed a 2013 lease. Respondent submitted into evidence a two-year renewal lease commencing November 1, 2013 in Tenant's name only, signed by Tenant and Respondent's Mother.
Tenant testified that he is familiar with the layout of the subject premises and other apartments in the "A" line at the Building; that he has been to apartments 7A and 12A; that they have the same layout; that the subject premises has three bedrooms, a kitchen, and a living room; that from the time that he moved into the subject premises he was in the front room with Respondent's Mother and the room by the foyer was Respondent's; that the middle bedroom was not occupied; that he lives in a single-family house in the Berkshires ("the other address") that he has owned for thirty years; that it was a weekend house before 2014; that he, Respondent's Mother, and his other two children occupied the other address; that Respondent had gone to college; that when Respondent came back Respondent would sometimes go to the other address with them, sometimes not; that his residency at the subject premises changed at some point because of his illness; that he could not take care of himself; that he was in a wheelchair; that it was difficult for him to be in the subject premises in a wheelchair; that he was getting bored and depressed; that he had to go to a sanitarium; that he was not being treated for his illness; that he suffered organ failure and was in a coma for two months in October of 2008; that he was in a hospital for a matter of years; that he was released to rehabilitation for about a year, in 2009; that he stayed there for two or three months; that there were a lot of operations; that he was living at the subject premises from 2009 through 2014; that he was also using the other address as well; and that his memory of dates is bad.
Respondent submitted into evidence Tenant's voter's registration in Massachusetts, going back to 2012; Tenant's driver's license in Massachusetts, issued in 2012; Tenant's 2013 Massachusetts tax return where he lists the subject premises as his address and where his status is "married filing separate"; and Tenant's 2014 Massachusetts tax return using the other address and where his status continued to be "married filing separate".
Tenant testified that he registered to vote in Massachusetts; that he first voted in Massachusetts in 2012; that he voted there in 2016, 2020, and 2022; that he never registered to vote from the subject premises; that he renews his driver's license every five years; that he first obtained a Massachusetts driver's license in 2005, 2006, or 2007; that after his recollection was refreshed, that he obtained a Massachusetts driver's license in 2012; that he had a driver's license in Massachusetts before that; that he did not have his license before 2012; that he filed a Massachusetts tax return for 2013 and 2014; that he used the subject premises as his address on his tax return because his W-2 forms had the subject premises on it; that he did not file a New [*4]York state tax return for 2013; that Respondent's Mother filed a return in 2013; that Respondent's Mother was not a resident of Massachusetts in 2013; that he filed in 2015 as single because Respondent's Mother died on December 31, 2014; that he did not file New York taxes after 2015; that in 2010 he would assume that he lived in New York but he was in a hospital; that in 2010 he was living at the subject premises; that he did not remember the exact date that Respondent came back from college to live at the subject premises; that the rehab facility was near the subject premises; that when the facility discharged him, he was at the subject premises; that 2013 is when he started living in Massachusetts; that from 2010 until 2013 he was at the subject premises most of the time; that he was in Massachusetts when he was not at the subject premises; that around 2013 or 2014 he was transferred to a hospital in Albany from Massachusetts; that he stopped living at the subject premises toward the end of 2013 or 2014; that he was shuttling a lot of personal property to Massachusetts during that time; that Respondent helped bring his books to Massachusetts; that he took his clothing out in 2013 or 2014; that he took his car to Massachusetts; that the car had always been registered in Massachusetts; that he used to have his car registered in New York; that Respondent's Mother was paying rent at that time; that into 2014 Respondent's Mother was "not there" mentally and physically; that Respondent's Mother was taking anti-depressants; that Respondent's Mother had knee surgery in 2014; that Respondent lived in the subject premises during this time; that his relocation to Massachusetts was permanent; that Respondent lived in the subject premises in 2010; that Respondent did not stop staying at the subject premises since Respondent came back; that Respondent was arrested; that he did not know the year; that Respondent was incarcerated in 2010 for about a year and a half; that Respondent was arrested a second time and was incarcerated for three or four years; that he heard that Respondent was getting released in 2014, so he picked Respondent up and brought Respondent back to the subject premises and went back to Massachusetts; that he sees a doctor once a year in New York; that he slept in the subject premises the last time that he came to New York; that he went to India in October of 2014, about a week after bringing Respondent back to the subject premises; that he returned to the U.S. in early 2015; that Respondent's Mother died in the other address; that Respondent's Mother had only been in the other address for a short while at the time of her passing; that he did not sign another lease after the 2013 lease; that Respondent has two children; that Respondent's Mother was getting chemotherapy for breast cancer, which was diagnosed one or two years before Respondent's Mother died; that he accompanied her to chemotherapy because she could not drive; that he came to New York, drove Respondent's Mother to New Haven, and then drove Respondent's Mother back to New York; that Respondent's Mother was unable to take care of him, when he was in a wheelchair, but he could not take care of her, which was one of the reasons why he felt that he could not live with her; that he had to move out because they had a contentious relationship at that point; that he gave Respondent money with which to pay the rent in a date he did not remember, because Respondent is his son; that he gave Respondent a rent check made payable to Petitioner because he was told that Petitioner would not accept a rent check from anyone but Tenant; that Respondent's Mother was not capable of doing that because of her mental and physical conditions, including bipolar disorder, cancer, and knee surgery; that he did not tell Petitioner that he was living in the subject premises in 2014 or 2015; that he did not remember what date Respondent was arrested, but he was in the subject premises at that time; that Respondent would have had to have been arrested before that; that Respondent was living in the front room of the subject premises; that in October of 2014 he picked up [*5]Respondent from prison; that he brought Respondent to the subject premises at that time; that Respondent lived at the subject premises at that time; that he observed Respondent living in the subject premises the few times that he came to visit; that after he was in India he came to Massachusetts and Respondent was in New York; that he did not visit the subject premises in 2015; that in 2013 he owned two Volvos registered in Massachusetts; that he kept those cars in Massachusetts; that he did not register the cars in New York; and that Respondent did not own those cars.
Tenant testified on cross-examination that Kim Whalen, listed on his tax return from 2013, was his accountant; that his accountant prepared the tax form for him; that he believed that he downloaded the form from the Massachusetts Revenue website; that he had not saved his own copy; that he went to his accountant and said, "this is where I am filing, and this is where I live"; that he assumed that he would file in Massachusetts because he was living there; that he had had the other address since 1992; that the other address was built for weekend use; that he moved full time to Massachusetts in 2013; that he did not remember which month; that he was already in Massachusetts before 2013; that he was in Albany Hospital nearby the other address; that he was spending most of his time in Massachusetts when he came out of rehab, which was before 2013, possibly 2012; that his accountant did not ask him if he was living in the other address; that he did not file a New York State or City tax return in 2013, but he did before 2013; that he thought he filed Massachusetts resident taxes in 2012; that he used the same accountant for that; that he did not remember if he had a Massachusetts driver's license before the one issued on August 3, 2012; that he remembered having a driver's license in New Jersey at one time; that Respondent's Mother lived in Lincoln Park across the bridge and he stayed there originally when he came to the U.S.; that he remembered that from the 1970s; that he had a driver's license in 2007 in New Jersey; that he had to fill out an application to get a Massachusetts driver's license; that he had to provide his address; that they did not ask about his marital status; that in 2012 he was living in Massachusetts; that he most likely picked 2012 to get a new driver's license because 2012 was when his New Jersey driver's license was expiring; that he had owned the cars for a couple of years before 2012; that he had registered them in Massachusetts for quite a while before 2012; that he first registered to vote in Massachusetts in 2012; that he did not remember the date that he registered to vote in Massachusetts; that he did not register to vote at the time that he obtained his driver's license; that he did not register to vote in New York because he was not a citizen at the time; that he became a U.S. citizen in 2012, although he did not remember the date; that he did not remember if he became a citizen before or after he obtained a driver's license; that he signed the lease for the subject premises on August 12, 2013; that he had already obtained a driver's license in Massachusetts, registered his vehicle, and registered to vote in Massachusetts by the time; that after he moved to Massachusetts he stayed in the subject premises some times when he came to New York; that in 2013 he came to New York; that he did not believe that anyone stayed in the room in the subject premises where Respondent's Mother had been staying; that he did not think that he came to New York in 2015; that he hoped and had an expectation that the room would be kept empty in honor of Respondent's Mother; that Respondent's Mother may have driven him to the other address because he was not driving at the time; that Respondent's Mother worked for the City and had a long holiday for a Jewish holiday; that in 2012 Respondent's Mother was living in the subject premises; that he and Respondent's Mother were not spending much time with each other in 2012; that Respondent's Mother could stay with him as long as she wanted although he did not remember the durations of her stays in 2012 and [*6]2013; that in 2014 Respondent's Mother did not come to the subject premises; and that he was in India when Respondent's Mother died.
Petitioner submitted into evidence the death certificate for Respondent's Mother. The death certificate stated that place of her death was the other address; that the date of death is December 31, 2014; that the other address was Respondent's Mother's address; and that Tenant was the informant.
Tenant testified on cross-examination that Respondent or one of his friends were the actual informant even though he is listed as an informant on the death certificate; that Respondent called him to tell him that Respondent's Mother had passed; that he did not contact Petitioner to let him know that he was moving; that he left Respondent's Mother in the subject premises so he just moved without informing anybody; that he did not remember if he paid rent with his own checks; that quite often he may have given Respondent's Mother checks drawn on his own account with which to pay the rent; that he used to give the amount and sign his name to the check; that he left the payee blank; that he gave Respondent's Mother checks as she needed; that he did not remember how many rent checks he gave Respondent's Mother from 2012 through 2014; that he gave Respondent checks with which to pay the rent that were signed with his own name; that he did not remember how many checks he gave Respondent; that he gave checks one at a time to Respondent; that the checks were drawn from his own account; and that he gave Respondent cash a couple of times with which to get rent paid.
Petitioner submitted into evidence a lead paint lease rider dated January 1, 2015 ("the Lead Paint Rider"). Petitioner submitted into evidence an affidavit of Tenant that stated that Tenant authorized Respondent to sign a rider on Tenant's behalf. Tenant testified on cross-examination that he may have told Respondent to sign his name.
Petitioner submitted into evidence a transcript from a trial dated July 14, 2009 of prior proceeding, 86 West Corp. v. Singh, Index # L/T 777814/2007 (Civ. Ct. NY Co.)("the prior proceeding"), where Respondent's Mother testified that she had a thirty-nine year old son who lived in Brooklyn, as did Respondent's brother. Petitioner also submitted into evidence a transcript from a trial from the prior proceeding dated September 15, 2009 where Tenant testified that Respondent lived in Brooklyn. Petitioner submitted into evidence the decision of the Court in the prior proceeding dated December 16, 2009 ("the prior proceeding decision") finding, inter alia, that Respondent lived in Brooklyn. Tenant testified on cross-examination that he remembered that Petitioner commenced a proceeding against him and Respondent's Mother about dogs; that he testified at the trial of that case; that Respondent returned to the subject premises after Respondent graduated from college; that he testified at some point that Respondent lived in Brooklyn; and that Respondent was released from prison in October, but he did not remember the year.
Tenant testified on redirect examination that in 2008 the subject premises was his primary residence and the other address was a weekend house; that Respondent was spending quite a bit of time there because Respondent had a child; that Respondent was living there even though his primary residence was the subject premises; that Respondent's books, clothes, bike, and chest were in the subject premises; that Respondent had a bicycle shop in Brooklyn; that he had two dogs; that the allegation in the case was that they were dangerous dogs; that in 2009 the dogs may have been in the subject premises or in Brooklyn; that before Respondent was released from incarceration there was a problem with rent being paid; that he went away for a month or two and he got a notice saying that rent had not been paid; that his other son, Nikolai Singh [*7]("Respondent's Brother"), was there and did not pay the rent; that he was still living in New York; that he had planned to go to India in 2014; that he left in November of 2014; that he had a roundtrip ticket; that he was planning to come back in February; that he assumed that Respondent and Respondent's Mother would take care of the rent; that in 2012 utilities in the other address were in his name; that Respondent is now married; that he attended their wedding, although he did not remember when it was; that Respondent's Mother worked at a high school in the Bronx when schools were in session; that the other address is a two-and-a-half hour drive to New York City; that Respondent's Mother died at the other address; that Respondent's Mother had knee surgery and had been at the other address for two or three days; that Respondent's Mother did not have a residence in more than one place; that Respondent's Mother lived at the subject premises; that he gave Respondent checks before he went to India because Respondent did not have the money and because Petitioner would not accept tenders from Respondent; that Petitioner accepted checks from Tenant; that he did not have the lead paint rider in front of him but he understood that something that to be done; that Respondent said that Tenant had to sign it so he said that Respondent could sign the rider for him; that he just wished that anything having to do with the subject premises would disappear because he had moved out and he did not want to visit because it brought memories; that it was why he did not go there; and that he did not feel this way before.
Jesse Such ("Respondent's Friend") testified that he lives elsewhere in Manhattan; that he has lived in New York City since 2009; that he knows Respondent; that he first met Respondent in late 2000 or early 2001 at Evergreen College where they were both students; that they met playing basketball; that they had a lot in common, so they were friends; that Respondent got him a job; that he graduated in 2002; that Respondent stayed to do a masters program; that he moved to Chicago; that he left Chicago in 2004; that he moved to Washington D.C.; that he lived in Washington from 2005 through 2007; that he then met his wife and moved to Mexico City until 2009; that he visited New York in late 2008 or early 2009 for job interviews; that he knew where Respondent lived because Respondent had said that Respondent lived on the Upper West Side; that when he was in New York for job interviews he got in touch with Respondent; that he was staying with his aunt in Irvington for that week; that he stayed with Respondent for one night at the subject premises to and from the job interview at this time; that the subject premises had a bedroom, a bathroom, another bedroom, a kitchen, then a living room, and then another bedroom where Respondent's mother was; that he stayed in the living room; that Respondent's bedroom was the first bedroom; that he came to New York on March 9, 2009; that he moved to Brooklyn for about two months; that after that he stayed at his aunt's apartment until some time in 2010; that he moved to 1858 7th Avenue after that and lived there until 2014; that they got two apartments in Washington Heights before his current address, where he has lived since 2021; that in 2009 he resumed his relationship with Respondent; that Respondent showed him the city, including where Respondent ate and the basketball court on the Upper West Side; that Respondent introduced him to family and friends; that he saw Respondent at the subject premises a couple of times a week in 2009 and 2010; that in 2009 and 2010 he had a bad roommate situation and anything to get out of the house helped him; that when he stayed at his aunt's house she was trying to sell it so he could only have a roll up bed there and nothing else so any place with a sofa and a place to stay was welcome; that he would stay at the subject premises even if only for a few hours; that he rode bikes with Respondent; that Respondent was a bike genius; that he would watch basketball games; that Respondent was a like a hippie; that he had [*8]free access to the food in Respondent's refrigerator; that he saw in Respondent's bedroom a bed, a lot of bike materials, and a lamp with a red Portland Trailblazers jersey over it; that Respondent was starting his own bike shop in Brooklyn; that usually Tenant and Respondent's Mother were there; that in 2009 and 2010 both of the parents were living in the subject premises; that he had a polite relationship with Tenant; that he bonded with Respondent's Mother, who was a social worker; that he worked in social services himself; that he had these conversations once a week; that sometimes if Respondent was not there he would wait for Respondent and talk to Respondent's Mother; that Respondent's Mother had two pit bulls who he liked; that he knew that in 2011 Respondent was incarcerated; that Respondent was released in mid-2012; that he saw Respondent at the subject premises after Respondent was released in 2012, at the same bedroom; that he was at the subject premises while Respondent was incarcerated; that nothing changed in the subject premises in terms of who occupied which bedroom during the incarceration; that when Respondent was released, he was back to seeing Respondent with the same frequency as before; that he was working on alternatives to incarceration; that he discussed his work with Respondent; that he was working to lower recidivism for a population that Respondent was not a part of; that he was devastated, stunned, and shocked when he heard that Respondent was arrested; that he thought that Respondent was arrested in 2010, released in 2011, then was arrested again in maybe 2012, and then released in 2014; that he had the occasional phone call and letter with Respondent while Respondent was incarcerated; that he went to the subject premises; that his aunt moved nearby the subject premises at 100 Riverside Drive; that because they were so close, Respondent's Mother would invite him and his wife over; that he was at the subject premises during the second incarceration once every couple of months; that Respondent was released in the fall of 2014, around October; that he knew about Respondent's release from conversations with Respondent's Mother; that he saw Respondent for the first time after incarceration on the street and he almost didn't recognize Respondent; that they got pizza and went back to the subject premises; that Respondent was with Tenant at the time; that Respondent was with Respondent's Mother also; that he saw Respondent again in 2014; that at that point with his work in alternatives to incarceration he felt like a mentor to Respondent, as Respondent was on parole; that their friendship became stronger; that he saw Respondent three or four times a week at that point; that he saw Respondent in the same bedroom as before; that he did not see Tenant staying in the subject premises; that Tenant was occasionally in the subject premises when Respondent was incarcerated; that Tenant was more in the background at that time; that Tenant and Respondent's Mother were both dealing with health issues at the time; that Tenant had cancer; that Respondent's Mother needed a full knee replacement; that Respondent's Mother might have had issues with addiction and mental health; that Respondent's Mother was at the subject premises occasionally, going to doctor's appointments; that they had another place in the Berkshires; that he was never invited to the Berkshires; that Respondent's Mother was the only person staying in the third bedroom at the time that Respondent was released in 2014; that he learned that Respondent's Mother died when he was at his aunt's house at 100 Riverside; that Respondent called and said that Respondent's Mother had died; that he walked over to the subject premises; that Respondent's Mother died in Massachusetts; that he did not know how long Respondent's Mother had been living there; that when got to the subject premises Respondent was in the shower and Respondent's girlfriend at the time was crying; that Respondent was not clear about how Respondent's Mother died; that Respondent was emotional and upset; that his wife was there with him at the time; that he was at [*9]the subject premises for a couple of hours; that he was at the subject premises on December 31, 2014; that he went to the subject premises after that; that he was trying to be a role model to Respondent and keep Respondent focused; that Respondent was living in the subject premises after Respondent's Mother died, except for a girlfriend; that Respondent was in the first bedroom for a while, but Respondent moved into Respondent's Mother's bedroom at some point, although he did not remember the exact date; that he came to the subject premises once or twice a week, because he would visit his aunt also; that he did not see Tenant there; that the name of the Building is "the Netherlands"; that there is a doorman; that there is a marble-looking hallway; that there are two hallways; that the doormen let them know when to use the service elevators for taking bikes up; that the doormen would let him up after a while of getting to know him; that his wife did not go to the subject premises as frequently as he did; that there were three doormen of Eastern European descent; that there was one doorman who was Asian; and that doormen were always there except once or twice they may have been getting a package.
Respondent's Friend testified on cross-examination that he did not keep a log of how many times he saw Respondent; that he did not sleep at the subject premises; that Respondent was his only friend in New York; that he did not see Tenant's personal belongings in 2015; that he knew who lived there based on conversations with Respondent's Mother; that he would leave the subject premises late at night and would only see Respondent there; that he did not talk about his testimony with Respondent or Respondent's attorney; and that he did not review any documents before his testimony.
Respondent's Friend testified on redirect examination that Respondent told him that Tenant was not living at the subject premises before Respondent's Mother died; that he did not see Tenant's jackets, shoes, or hats; and that the hallway became a bike corridor.
Faruk Kukaj ("the Super") testified that he has been employed at the Building as a super full-time since 2010; that he used to be a part-time doorman in around 2002 or 2003 up to 2004; that he worked sixteen hours per week, on Saturdays and Sundays from 4 to 12; that the Building had doorman coverage 7 days a week from 4 to 12; that there was no doorman otherwise until 2011; that doorman coverage was 24 hours a day, 7 days a week; that he lives on the first floor of the Building, in an apartment off of the lobby; that he has an office in the basement of the Building; that a porter works in the Building; that he works from 9 to 5, five days a week; that he responds to emergencies during off-hours; that he works for management of the Building, who works for the board of a condominium; that the subject premises is a sponsor unit; that there are six sponsor units left in the Building; that his job responsibilities are the same for sponsor units as they are for other units; that he reports to the sponsor problems that he observes; that he has known Respondent since 2002; that Respondent was living in the subject premises in 2002; that in 2010 he observed Respondent in the subject premises; that in 2010 he saw Respondent like he saw everyone else; that he was in the subject premises when he was there as a super; that from 2010 to 2015 he was in the subject premises more than twenty times because tenants call the super for problems; that he tried to repair conditions in the subject premises but he had to call plumbers; that he saw bikes hanging in the hallway and the first bedroom; that Tenant and Respondent's Mother also lived in the subject premises in 2010; that he saw Respondent in the common areas of the Building and the subject premises; that he saw Tenant in the subject premises in 2010; that he only saw Tenant once after Respondent's Mother died; that he saw Tenant once or twice in the six months before Respondent's Mother died; that he saw Respondent in the Building and the subject premises in the five or six months before [*10]Respondent's Mother died; that after Respondent's Mother died he used the third bedroom; and that no one else asked him to testify in this case.
The Super testified on cross-examination that he started in September of 2010; that he left in the summer of 2004; that he had no relationship with the Building from 2004 through 2010; that he was not aware that Respondent was involved with bikes; that he did not know what Respondent did for a living; and that he did not have doorman duties from when he started as a super.
The Super testified on redirect examination that he is in the Building when he is not on duty.
Dino Nikocevic ("the Doorman") testified that he lives in Yonkers; that he is employed at the Building; that Douglas Elliman is his employer; that Douglas Elliman is the management; that he is a doorman; that he has been working as a doorman since January 1, 2011; that his hours since that time have been Monday to Friday, 8 a.m. to 4 p.m.; that the Building has 68 apartments; that he maintains a log for things like deliveries; that the front desk is visible when you enter the Building; that he announces guests using an intercom; that he has access to a list of who lives in the Building; that he generally familiar who lives in the Building; that that Tenant and Respondent's Mother lived in the subject premises in 2011; that she died in 2014; that he did not remember Respondent's Mother's name; that he knows Respondent and Respondent's name; that he knew Respondent since August of 2011 when Respondent came back; that Respondent left in April of 2012; that Respondent then returned in October of 2014; that Respondent was living there and staying there all the time; that he saw Respondent every day; that that he has not been to the subject premises; that other staff goes to visit apartments; that Tenant left around 2014 or 2015; that he knew Tenant left because he did not see Tenant and Respondent's Mother said that they moved to a house in the country in Massachusetts; that he did not speak to Tenant; that he did not observe Tenant moving out of the Building; that Tenant visited after Tenant moved out; that he saw Tenant a few times after Respondent's Mother died; that Nikolai Hassan told him that Respondent's Mother died on December 31, 2014; and that Tenant was at the Building for three days after that.
Respondent submitted into evidence a subpoena that Respondent had served upon the Doorman.
The Doorman testified on cross-examination that he was posted in the lobby; that he does not have a log for residents of the Building coming and going; that he did not know why Respondent was coming and going; that he left his shift after 4 p.m.; that Respondent's Mother said that Tenant and Tenant's son who was not Respondent left but Respondent's Mother did not leave; that Tenant would come for doctor's appointments occasionally; and that Tenant would bring a suitcase with him.
The Doorman testified on redirect examination that Tenant had different kinds of luggage with him; that he saw Tenant maybe five times after that; and that he never entered Respondent as a visitor because Respondent's Mother said that Respondent was living with her, was her son, and had a key.
Nadia Barnes ("Former Roommate") testified that she lives in Florida; that she has a degree in Business from a college in Massachusetts; that she is not currently employed; that she was last working in June of 2024 at a commercial real estate form in Florida; that she had been employed there for a year and a half; that she has lived in Florida since 2020; that she lived in New York City before that; that in New York City she worked for a commercial real estate [*11]company and she managed a building in Chelsea and one in New Jersey; that she had been there for twelve years; that she has testified in about five court proceedings before, including in New York City at the Loft Board; that the law firm Belkin Burden, by Joe Burden, represented her employer at that time; that she knows Tenant and Respondent's Mother; that she first met them over forty years ago in Massachusetts; that Tenant and Respondent's Mother were living in New York but they rented a house in Massachusetts near where she had lived and that is where she met Respondent; that Tenant's family is like her family; that Respondent's Mother was like her mother; that Tenant took her and her siblings and cousins under their wing, taking them on adventures, to the city; that they have been a huge part of her life since she was young; that she considered Respondent's Mother as her other mother; that she moved to New York in 2012 at the subject premises with her daughter, who was going into eighth grade at the time; that Respondent's Mother and Tenant were living in the subject premises at the time; that Respondent was incarcerated at the time; that she stayed in Respondent's bedroom; that she knew that it was Respondent's bedroom because she had visited before 2012; that she had visited two, three, or four times before 2012; that in 2011 Tenant, Respondent's Mother, and Respondent were all living there at the time; that she did not remember if she visited the subject premises in 2010; that she probably visited before that time, but she did not remember dates; that before 2011 she observed that Respondent's Brother, Respondent, Tenant, and Respondent's Mother were living in the subject premises; that she loved the doormen; that she had been in the presence of the doormen since she was little; that she did not remember the doormen coming up to the subject premises with her; that if there was a new doorman it is possible that they may have come to the subject premises; that in 2013 she was living in the subject premises; that Respondent was at Riker's Island and upstate; that she was in contact with Respondent while he was incarcerated; that she knew he would be calling because it was a collect call; that she spoke with Respondent maybe ten or fifteen times; that she and Respondent exchanged letters and maybe a care package; that she learned that Respondent was being released from incarceration on or about October 1, 2014; that she visited the subject premises in that week; that Respondent's Mother and Respondent were living in the subject premises in 2014; that Respondent was living in the same bedroom he was living in before; that she moved out of the subject premises in October or November of 2014; that Respondent and Respondent's Mother were living there at the time; that she moved to other apartments in Manhattan after that; that Tenant moved out of the subject premises; that Tenant moved stuff out; that on weekends she brought Tenant items that Tenant requested from her by calling her; that Tenant wanted to live in the country because of his illness of multiple myeloma, for which he received treatment in Manhattan; that Tenant moved to Massachusetts at the end of 2013 or beginning of 2014; that Respondent's Mother had breast cancer that had been diagnosed in 2013; that she helped Respondent's Mother; that she took Respondent's Mother to medical appointments in Manhattan and helped with medication and injections; that Respondent's Mother was either at the subject premises or Massachusetts while undergoing treatment for breast cancer; that Respondent's Mother had been employed as a social worker at a school in the Bronx; that Respondent's Mother retired at some point but she did not remember when; that Respondent's Mother died on December 31, 2014; that Respondent's Brother found Respondent's Mother's body in Massachusetts and called her in Atlantic City where she was for New Year's; that Respondent's Mother was recovering from knee surgery from October of 2014 in Massachusetts at the time; that after Tenant moved out of the subject premises, she did not see Tenant living in the subject premises but she saw Tenant visiting the [*12]subject premises, although infrequently and only for doctor's appointments; that sometimes Tenant would come to New York and leave in the same day; and that she lived in the subject premises again from 2016 through about 2019.
Respondent submitted into evidence a subpoena for Former Roommate.
Former Roommate testified on cross-examination that she did not know if Petitioner knew that she was living in the subject premises; that Tenant renewed a lease; that she knew if Tenant was coming to New York because he often got in touch with them and Tenant was very close with her and her daughter; that she had not been talking to Respondent's Mother from October through December of 2014 because they had had an argument; that Respondent's Mother called her the day before Respondent's Mother died; that Respondent's Mother could not move her legs for two or three weeks; and that she was not in Massachusetts from October through December of 2014.
Former Roommate testified on redirect examination that Respondent's Mother did not move out of the subject premises; that Respondent's Mother was in the other address a lot; and that Respondent's Mother would sometimes say that she was going to move out but Respondent's Mother would change her mind.
Justin Counter ("Respondent's Other Friend") testified that he has lived in Bend, Oregon since May of 2023; that he lived in New York before that since 2003; that he has known Respondent since 2004 after they met through mutual friends and created a friendship from there; that he was a muralist for many years; that they both liked cycling; that they were pretty close; that they tried to get together about once a month; that he would go to Respondent's "house"; that their friendship continued while he was living in New York City; that Respondent's home was the subject premises; that the apartment number was "5A"; that he was at the subject premises maybe thirty-five or forty times in total; that Respondent had a bedroom in the subject premises; that Respondent had bikes and sports stuff; that Respondent lived at the subject premises; that from 2009 he visited Respondent at the subject premises; that Respondent worked at a pedi-cab spot on Houston Street; that Respondent's son was born in May; that he went to dinner with Respondent; that Respondent was very excited; that in 2010 Respondent was incarcerated starting in April or May; that Respondent was incarcerated for a year, until the end of August of 2011; that they went bike riding at that time; that from August of 2011 he visited Respondent at the subject premises at least ten times; that he knew Respondent's Mother as Respondent's mother; that he knew Respondent's stepfather, Tenant; that he met them through Respondent; that in 2012 Respondent's Mother lived there; that he believed that Tenant lived there but he did not see Tenant as much; that he knew about an illness that Tenant had; that Tenant had cancer and it was bad before that, in 2008 or 2009; that he did not know where Tenant was treated for his illness; that Tenant moved out in the fall of 2013; that he helped Tenant move some boxes out because Respondent asked him to move; that Respondent was incarcerated in Watertown for a second period of time, in 2012; that he was in contact with Respondent while Respondent was incarcerated by correspondence and by phone; that they sent letters to each other; that he sent Respondent packages, like winter boots; that he added money to Respondent's books so that Respondent could purchase things from the commissary; that he spoke to Respondent by phone frequently; that he did not know what was in the boxes; that he moved five or six of them to Tenant's car; that Tenant was going to Massachusetts; that Respondent was released from incarceration a second time around 2014; that he took Respondent to buy clothes and bought a jacket for him; that after Respondent was released he [*13]saw Respondent the first day back at the subject premises; that he had spoken to Respondent's brother and mother before Respondent came home; that he had bought Respondent a jacket a few days later; that the first day back they went to a gallery opening downtown; that Respondent was living at the subject premises upon his return; that he visited Respondent at the subject premises over five times from the time of Respondent's release through the end of 2024; that Respondent's Mother was living in the subject premises at that time; that they did not discuss Respondent's Mother's illness and he was not aware of specifics; that he knew that Respondent's Mother died from Respondent at the end of the year of 2014; that he visited Respondent at the subject premises in 2015 a handful of times, maybe every couple of months; that he was in communication with Respondent other than seeing him at the subject premises; that they would communicate by phone and text; that he saw Tenant at the subject premises some time after packing up the boxes but he did not think that Tenant was living there but was just visiting because he did not see Tenant at the subject premises when he normally visited; and that he spoke to Respondent, who said things about Massachusetts.
Respondent submitted into evidence a subpoena of Respondent's Other Friend.
Respondent's Other Friend testified on cross-examination that Respondent's Mother was named Vincentine; that he slept at the subject premises maybe two times; that the ten times that he saw Respondent after his release were not always at the subject premises; that Tenant did not say that he was moving to Massachusetts; that Respondent had four or five bikes; that Respondent was an avid cyclist; that he knew about a bike business that Respondent ran; that the business was in Bed-Stuy; that Tenant slept in the master bedroom of the subject premises; that he did not go into the main bedroom until Respondent's Mother died; that he was unaware of anyone else living in the subject premises in 2014 besides Respondent and Respondent's Mother; that he met the Former Roommate at the subject premises; that the Former Roommate was staying there with her daughter; that he did not remember the dates that the Former Roommate was living there; that he understood that Tenant moved between autumn of 2013 or spring of 2014; that he did not move anything to Massachusetts; and that he spoke to Respondent's counsel to prepare for testimony.
Respondent submitted into evidence the following documents that use the subject premises as Respondent's address:
• New York Police Department ("NYPD") records for Respondent's arrests on April 20, 2010 and April 8, 2012;
• Department of Motor Vehicles ("DMV") records in June of 2012 and in November of 2014 and Respondent's driver's license, issued November 7, 2014;
• New York City Board of Elections ("BOE") records showing Respondent registered to vote at the subject premises as of August 25, 2003, and showing that he voted in 2008, 2010, 2016, 2020, 2022, and 2023;
• A letter dated April 23, 2012 to Respondent from the New York City Department of Education ("DOE");
• DOC records for Respondent dated June 4, 2012 listing the subject premises as Respondent's address at that time for six years, and documents issued by DOC dated September 26, 2014 and September 30, 2014 stating that the subject premises was Respondent's residence and approving his return thereto;
• Federal and New York State tax returns for 2014, filed in 2015, and a 1099 form;
• A letter dated December 31, 2014 from the U.S. Department Of Education concerning [*14]Respondent's student loans;
• Letters from collection agents dated June 13, 2009, January 11, 2010, February 6, 2010, June 7, 2010, and October 5, 2010;
• Documents dated November 19, 2011, November 22, 2011, December 3, 2011, November 14, 2014, November 19, 2014, January 17, 2015, February 3, 2015, February 7, 2015, and March 20, 2015 from Medicaid and the Human Resources Administration ("HRA");
• A letter dated February 24, 2015 from the Social Security Administration ("SSA") ;
• A letter dated May 11, 2015 from a health insurer;
• Bank statements from Respondent's savings account from November of 2009 through March of 2016;
• Bank statements from Respondent's checking account from 2011 through 2015 that, inter alia, allowed Respondent's Mother to be a signer on the bank account and an attorney-in-fact on the account;
• Statements from an online securities trading account from 2011 through 2015.
Respondent submitted into evidence rent checks, signed by Tenant dated September 2, 2014 and January 1, 2015.
N.Y.C. Admin. Code §27-2075(c) provides that a tenant shall submit an affidavit at an owner's request setting forth the names and relationship of all occupants of the subject premises. Respondent submitted into evidence an affidavit dated August 28, 2012 that Respondent's Mother filled out pursuant to this statute dated August 28, 2012 listing occupants of the subject premises, included Respondent. Respondent submitted into evidence an email dated September 6, 2011 from Respondent to Petitioner asking for a new lease for the subject premises and stating that he was Respondent's Mother eldest son, that he resided at the subject premises for prior nine years and from 1974 through 1988 before that and also asking that he be put on the lease.
Respondent testified that he lives at the subject premises; that he is 54 years old; that he first moved into the subject premises in July of 1975 after he had turned five years old; that his father, Frank Loverro, and his mother, Respondent's Mother, lived at the subject premises at the time; that he lived in the subject premises from 1975 until June of 1988; that he had a brief respite in high school when he lived in New Jersey; that he went to college at Evergreen State College in Olympia from 1988 until 2002; that he visited every year for at least month; that Respondent's Brother is Respondent's Mother's youngest son and Tenant's son, so his half-brother; that he graduated with degrees in biology and Spanish in September of 2002; that after graduating he moved to New York City in December 2002; that he moved his stuff back to the subject premises in the first bedroom; that he lived at the subject premises until January of 2009; that he was the sole proprietor of a bicycle shop; that he has two children; that his first child is named Moss, born on XX XX, 2009; that in 2010 he was living at the subject premises until April 20, 2010 when he was arrested; that he was located at the Manhattan Detention Complex; that he was away based on the arrest from April 20, 2010 until August 19, 2011; that he was released because he made bail; that he came back to the subject premises when he was released; that he got a job as a bicycle mechanic at a shop at 13th Street and Avenue B called "Continuum Cycles"; that Respondent's Mother, Respondent's Brother, and Tenant lived in the subject premises at the time, in 2011; that in 2012 he was living at the subject premises; that on April 8, 2012 he was arrested at the subject premises; that because of that arrest he was out of the subject premises until October 2, 2014; that he was at the Tombs and then was transferred to Riker's Island and then to Ulster Correctional Facility in August 2012 and then to Cape Vincent [*15]Correctional in Watertown, New York, where he served the rest of his sentence, a good six hours from New York City; that he was eligible for parole in August of 2012; that he did not have the rehabilitation programs needed for parole at that time; that one facility assigned him several programs that he had to complete; that he was subsequently granted parole release in August of 2014 and the release date was set for mid-October, but he was released before that, on October 2, 2014; that he provided the subject premises as his address on forms for his release; that there were many times when he was interviewed and that was the address on his identification; that he had to give Department Of Corrections ("DOC") a backup address if they did not like his primary address as an alternative to a halfway house; that the parole board approved the subject premises and 24 Charles Street, New York, New York ("the Other Manhattan Address"), which was the address of dear family friends, David Weinberg and Melanie Weinberg; that the Other Manhattan Address was given to the DOC because they were intimately involved in his support network; that he felt comfortable enough to ask them if he could stay with them if the terms of parole did not approve the subject premises; that the parole board approved the Other Manhattan Address; that Tenant drove him from Watertown; that he had called Respondent's Mother to let her know that the release date had been moved up and Respondent's Mother made arrangements for him to be picked up; that he got in touch with his family upon his release; that he sent letters and called; that he had personal visits; that Respondent's Mother visited him in Watertown about four times; that Tenant visited him twice, the second time when Tenant picked him up; that friends visited him; that he received packages from his mother, Tenant, the Former Roommate, Respondent's Brother, and Respondent's Other Friend; that Respondent's Mother told him on the phone that she had breast cancer in 2013; that when he came back to the subject premises in 2014 Respondent's Mother was living there and Respondent's Brother was staying there and looking for his own apartment; that there was someone living with them named D'Angelo Justice for a brief time; that Respondent's Brother was in a car crash where he almost lost his leg; that he had conditions of parole release; that he had a parole officer in an office in Manhattan; that his parole ended eighteen months early; that his parole was from October 2, 2014 until May of 2016; that a parole officer came to his home a few times a year; that Respondent's Brother and his girlfriend moved out; that he was living in the first bedroom; that Respondent's Mother was in the smallest bedroom right off of the kitchen and she spent a lot of time in the living room; that he went with Respondent's Mother to her last round of chemotherapy on October 5, 2014; that she suffered from a knee problem and had knee replacement surgery in November of 2014; that Respondent's Mother spent two to three weeks in the hospital because of the knee surgery; that he visited her five times a week; that Respondent's Mother returned to the subject premises after recovery from the knee surgery; that Respondent's Mother was not being treated for breast cancer at that time; that Respondent's Mother was at the subject premises until Christmas of 2014; that Respondent's Mother did not like her physical therapy and wanted to move to Massachusetts for her treatment, so on December 26, 2014 Respondent's Brother came down; that it was difficult for Respondent's Mother to walk and they got her to the car and they drove up to Massachusetts; that Respondent's Mother died five days after, at the other address; that Respondent's Mother had been employed previously as a school counselor and a social worker for DOE in the Bronx; that Respondent's Mother was forced into retirement in 2014; that Tenant suffered from multiple myeloma from October of 2008; that Tenant was treated for that illness until 2013 or 2014; that Respondent's Mother was deeply involved in Tenant's recovery and they thought it would be best for Tenant to be in Massachusetts; that in 2013 Respondent's Mother [*16]said that she was going to move there; that Tenant had driven to Watertown from Massachusetts; that Tenant had books, tools, clothing, cooking and cleaning paraphernalia, computers, and furniture in the subject premises; that when he returned in 2014 Tenant was not living in the subject premises; that Tenant's bed was left in the subject premises; that Tenant's computer was left to him; that there were some of Tenant's books in the subject premises; that all of Tenant's essential items were gone from the subject premises; that the personal property was left in increments with the help of friends and his brother; that Respondent's Mother told him that Tenant had a bunch of heavy stuff that Tenant wanted to take to Massachusetts; that there were boxes there when Respondent's Brother was away; that Respondent's Mother asked if there were any friends of his who could do that; that he asked Respondent's Other Friend and his brothers and Former Roommate to help with carrying boxes; that he wanted to go to Massachusetts but he was not allowed because of the parole; that he went to Manhattan; that Tenant went straight back to Massachusetts after maybe staying the night; that Tenant went to India two weeks after that; that Tenant was going to be in India for six months; that Tenant was born in Punjab; that Tenant has a lot of family in Punjab; that Tenant came back on January 5 after they told him about Respondent's Mother dying; that Tenant came to New York and spent between 8 and 24 hours' maximum in New York and then went back to Massachusetts; that he signed Tenant's name to the Lead Paint Rider; that he did not sign his own name because Petitioner did not recognize him; that he was concerned that Petitioner would reject it; that Tenant was living in Massachusetts at the time that the Lead Paint Rider was signed; that Tenant did not live in the subject premises after 2013; that he visited Tenant in Massachusetts; that Tenant and Respondent's Brother were living there; that Tenant came to the subject premises once or twice a year after Respondent's Mother died, mostly to go to doctor's appointments; that Respondent spent the night maybe once in 2015; that Tenant did not want to be around the subject premises after Respondent's Mother died because it brought back too many memories; that he registered as a voter at the subject premises; that he was a teacher and had a license; that he obtained a teacher's license in 2005; that he taught from 2003 through 2005; that the license exists but he is blacklisted; that his girlfriend at the time was staying with him; that when Respondent's Mother was ill she was not able to pay and Tenant took on the payment of rent for Respondent's Mother; that Petitioner would not accept tenders from him because he was not the tenant of record; that he did not have money to pay the rent; that Tenant helped him get back on his feet; that he was not able to pay rent to Petitioner at any time; that he put money for rent in his account; that in Court Petitioner agreed to accept tenders from him; and that he would personally tender rent to Petitioner.
Respondent testified on cross-examination that he was incarcerated from April if 2010 to August of 2011, around the time that he received some of the mail in evidence; that he was not physically present at the time; that he was convicted of a felony of conspiracy to commit murder someone who he is friends with today; that he went back to prison from April of 2012 to October of 2014; that he lived in the subject premises between August of 2011 through April of 2012; and that from 2002 through 2014 aside from being incarcerated he lived in the subject premises.
Petitioner submitted into evidence judgment dated June 14, 2007 of a criminal conviction of Respondent from a Court in Kentucky. Respondent testified on cross-examination that he had a criminal conviction in Kentucky in 2007 for possession of a controlled substance in the first degree; that he was not living in Kentucky; that he had been in Kentucky for two days at the time he was arrested; that he had been living at the subject premises; that he came to Kentucky for the [*17]sentence; that when he was arrested it was the first time he was in Kentucky; that he was with the friend who he conspired to murder at the time; that he was never in possession of a controlled substance; that he was convicted of that; that he was visiting his friend who had relatives who his friend was staying with; that the relatives had a guest house; that he has not been back to Kentucky since he was convicted; that he had been in custody in Kentucky for less than twenty-four hours; that he was on probation through June of 2012; that he was arrested in New York in 2010; that the arrest was probably a violation of probation in Kentucky; that he did not remember if anyone notified authorities in Kentucky; that he was on parole at the end of November of 2015; that an attempt was made to arrest him at a parole office and extradite him to Kentucky; that his attorney resolved the matter; that he knew about litigation about dogs in the subject premises; that he has a son who was born in May of 2009; that he was a father by the time Respondent's Mother's testimony in July of 2009 occurred; that he started dating the mother of his son in May of 2008; that he had met the mother of his son in May of 2007; that the mother of his son lived on Columbia Street in Red Hook, Brooklyn; and that in 2008 he was sleeping at this apartment in Brooklyn for several weeks or a couple of months for about four nights a week, but not from May to September of 2008.
Petitioner read into the record Respondent's deposition testimony that he met the mother of his son on December 31, 2007; that they started dating in May of 2008; that by September of 2008 she was pregnant; that from June to September 2008 he spent four nights a week on average sleeping over; and that he almost never slept over with her after she got pregnant.
Respondent testified that he was still in a relationship with the mother of his child after she was pregnant; that it was not a committed relationship but it was a committed relationship with regard to his child; that during the period of his son's birth he did what was possible to make the relationship work; that after his son was born he spent a considerable amount of time parenting his son and helping out as he could, and this would be four nights a week; that in January of 2009 she moved to St. Marks Place in Brooklyn, then in January of 2010 to an apartment on Halsey Street in Brooklyn; that he spent nights sleeping at St. Marks and Halsey; that he slept at the apartment on St. Marks Place maybe once or twice a week; that after she gave birth and moved to Halsey Street, from January through April of 2010 he spent maybe three or four nights per week there; and that after he was arrested he did not sleep at his girlfriend's apartment.
Petitioner submitted into evidence an article dated December 21, 2009 from the New York Times about Respondent's bicycle business in Brooklyn that stated, inter alia, that Respondent's "wife's job pays the rent at home". Respondent testified on cross-examination that he was the only owner of a business on Willoughby Street in Brooklyn, a business renting, repairing, and selling bicycles, from 2008 through July of 2010; that he had people working for him; that he worked long hours; that the Brooklyn addresses where his girlfriend lived were about one or two miles from his business; that getting to his girlfriend's apartment was convenient; that from the subject premises to the business was probably ten miles; that the New York Times interviewed him around that time; that the article constituted an opportunity to market his business; that he thought characterizing himself as married would cast himself in a more family-friendly light; that he did not give the reporter information about whether his "wife pays the rent at home"; that he went to City College from 2003 to 2005 to get a master's in education; that he was working on a dissertation for the first six months during the real crunch time in 2005, mostly not in school but sometimes to work at a computer center or consult with a [*18]professor; that the subject premises was not a productive space for him and he needed some place to keep stuff and work; that in 2005 he rented a room at an apartment on Riverside Drive in Manhattan so he could work on a dissertation in some peace and quiet; that two or three nights a week he slept at Riverside Drive, but the bed there was not comfortable and he preferred to be in his own bed; that the subject premises was one or two miles from the Riverside Drive apartment; that he was receiving unemployment benefits at the time; that the dissertation ended in the summer of 2005; that the arrangement at Riverside Drive continued through 2008; that after his dissertation ended he was a pedicab driver from nighttime rush hour, sometimes until 3 a.m.; that he had access to the apartment on Riverside Drive; that he slept at the subject premises; that generally he did not sleep at the Riverside Drive; that he spent the night at Riverside Drive once every two weeks; that he paid $600 a month for it; that he used the room for purposes other than sleeping; that the place where he parked the pedicab was called "the hub"; that he was just paying parking and rental for the pedicab; that he developed a business relationship with the owner of the "the hub"; that he signed Tenant's name on the Lead Paint Rider because he asked Tenant about the form and Tenant said that he could sign the form; and that Tenant was living in Massachusetts at the time.
Respondent had submitted into evidence a letter that he sent to Petitioner on January 21, 2015 stating that he, his girlfriend, and his cousin were living at the subject premises with Tenant, who Respondent identified as Respondent's stepfather and that he was requesting additional keys. Respondent testified on cross-examination that he relied on Tenant for financial help; that Respondent's Mother had died recently; that he did not ask Tenant for the subject premises because Tenant had just lost Respondent's Mother; that he was lonely after Respondent's Mother died; that he did not want the doorman to stop Tenant when Tenant came to the subject premises; that he did not want Petitioner to stop Tenant from entering the subject premises; that he wanted Tenant to come; that Tenant did not want to come; that he wanted Tenant to feel welcome and connect with him; that he was not allowed to go to Massachusetts; that he let Tenant stay wherever in the subject premises Tenant wanted to; that he was not reliant on Tenant to pay the rent; that he paid rent in 2015; that they would not accept money from him so he did not know how that happened; that Respondent's Mother was getting a knee replacement after coming out of chemotherapy; that Respondent's Mother was not capable of taking care of her bills; that Tenant wrote checks for Respondent's Mother so Tenant wrote checks in advance of Tenant's trip to India; that the knee replacement was in 2014; that Respondent's Mother then gave him the checks to pay the rent; that he paid the rent with those checks; that those checks were used up; that Tenant told him that Tenant vacated the subject premises; that he got mail at the subject premises because he supplied the address to the people who mailed the information to him; that around September of 2014, DOC came to the subject premises to interview Tenant and Respondent's Mother; that Respondent's Mother was his attorney-in-fact because he wanted Respondent's Mother to take care of things while he was incarcerated; that this continued after he was released; that the designation continued after Respondent's Mother died; that Respondent's Mother was his attorney-in-fact on statements from the Bank of America statements during the time that her was incarcerated; that after Respondent's Mother died, Respondent's Mother was still listed as an attorney-in-fact on the statements; that he did not get mail from his bank in prison but he got letters in prison; that there are strict regulations as to what he could receive by mail in prison; that he was not sure whether he could receive bank statements in prison; that when he was incarcerated he did not request to [*19]have bank statements sent to prison; that he was incarcerated on dates when the bank statements and other exhibits were being mailed to the subject premises; that he had various statements mailed to the subject premises out of necessity; that it would be against his best interests and unsafe to have sensitive financial data be sent to a prison; that he often had packages stolen; that he wanted Respondent's Mother to have access to money if she needed it; and that he did not notify any financial institutions that he was renting a room in another apartment or that he spent time at his girlfriend's apartment.
Respondent testified on redirect examination that he has been diagnosed with stage three colorectal cancer; that he got chemotherapy which affected his memory and his mood; that the drugs are still in his system; that he had checking and savings accounts; that at some point the account went dormant so he just has a checking account; that the Bank of America accounts were not credit card statements that required him to make a payment; that at some point he had a negative balance; that one of the mailings was a report on his investments and did not require him to do anything; that he did not have a written lease for the room he rented on Riverside Drive; that he got a few pieces of mail from City College at the apartment on Riverside Drive and nothing else; that he did not get mail where his girlfriend lived; that he was not on the lease where his girlfriend lived; that he was not involved in the ownership of the cooperative apartment that his girlfriend purchased; that Respondent's Mother's testimony in 2009 that he was living in Brooklyn was not true; that he was living at the subject premises at that time; that he spent some time in Brooklyn several days a week after his son was born in May of 2009; that in July of 2009 he did not know about Respondent's Mother's testimony; that he was not asked to testify in that trial; that the issue in that trial was an allegation that dogs were aggressive; that his residence was not an issue in that case; that at that time his girlfriend rented an apartment on St. Marks; that his girlfriend bought a cooperative apartment on Halsey Street as of January of 2010; that he had no documents with that address on it; that he had no other address for any indicia other than the subject premises; that he kept renting the room after his dissertation finished because he had Respondent's Brother at the subject premises; that there were issues about doing adult things like having girlfriend that he did not want to do where Respondent's Mother was; that he had a lot of possessions and he wanted to use the room for storage; that it was like an office; that he stopped renting the room in 2008; that he tried to pay rent for the subject premises after Respondent's Mother died in January of 2015; that Petitioner refused to accept Respondent's payments because he was not the tenant of record; that he paid Petitioner rent based on Tenant's check because Petitioner would not accept his tender; that Tenant entrusted him to make sure that the rent was paid; that Tenant was visiting his family in India at the time that he tendered the check; that Petitioner accepted the check; that Tenant was living in Massachusetts in 2015 and had been there for two or three years before that; and that in 2015 when he came home, the subject premises was very similar to what it looked like but there were books and family heirlooms of Tenant's that were no longer there.
Discussion
In order to succeed to a Rent-Stabilized tenancy, Respondent must prove that he is a family member of the previous tenant and that he co-resided with the previous tenant for two years before the tenant's permanent vacatur. 9 N.Y.C.R.R. §2523.5(b)(1). Petitioner concedes in its post-trial submission that Respondent is Respondent's Mother's son, which qualifies him as a family member for this purpose. 9 N.Y.C.R.R. §2520.6(o)(1). Respondent still bears the burden of proving co-residency. Waterside Plaza Ground Lessee, LLC v. Rwambuya, 131 AD3d 867 [*20](1st Dept. 2015), 53-63 Partners LP v. Wright, 65 Misc 3d 142(A)(App. Term 1st Dept. 2019).
The Court has already adjudicated, and Tenant effectively conceded, that he has not been maintaining the subject premises as his primary residence. Documentary evidence of the type indicating primary residence showed that Tenant was no longer living in the subject premises as of 2014, including his registration to vote in Massachusetts as of 2012, Glenbriar Co. v. Lipsman, 5 NY3d 388, 392-393 (2005), Brg 321 LLC v. Hirschorn, 52 Misc 3d 131(A)(App. Term 1st Dept. 2016), his driver's license issued in Massachusetts in 2012, Glenbriar Co., supra, 5 NY3d at 392-393, 300 East 34th St. Co. v. Habeeb, 248 AD2d 50, 55 (1st Dept. 1997), Columbus Manor, LLC v. Turnbull, 63 Misc 3d 143(A)(App. Term 1st Dept. 2019), and his 2014 Massachusetts tax return. Glenbriar Co., supra, 5 NY3d at 392-393, Second 82nd Corp. v. Veiders, 146 AD3d 696 (1st Dept. 2017), Columbus Manor, LLC, supra, 63 Misc 3d at 143(A). While this record does not prove a discrete date on which Tenant permanently vacated, the preponderance of the evidence showed that such vacatur was complete well before December 31, 2014.
Respondent's Mother had been the leaseholder of the subject premises before Tenant moved in and Respondent's Mother and Tenant, as spouses, both executed leases for the subject premises. A co-tenant has a legal right to be present on the demised premises without the consent of the other co-tenant, Preferred Mut. Ins. Co. v Pine, 44 AD3d 636, 639 (2nd Dept. 2007), and whether or not the co-tenant is in actual possession of the subject premises. Butler v. Rafferty, 100 NY2d 265, 269 (2003).[FN2]
See Also 56 Mac D., Inc. v. Andria, 3 Misc 3d 1105(A) (Civ. Ct. NY Co. 2003), aff'd, 3 Misc 3d 133(A)(App. Term 1st Dept. 2004)(the interest of a co-tenant is separate from and independent of the interests of other co-tenants). Accordingly, Tenant's vacatur from the subject premises did not affect the continued tenancy of Respondent's Mother, which continued until her passing on December 31, 2014.
Under normal circumstances, Respondent would only have to prove his co-residency from December 31, 2012 through December 31, 2014, the two years before Respondent's Mother's passing. However, Respondent's incarceration from April 8, 2012 through October 2, 2014 occasions scrutiny as to his residence before December 31, 2012. ALH Props. Eleven LLC v. Vejarano, 38 Misc 3d 133(A)(App. Term 1st Dept. 2013), City Realty Associates Limited v. Westreich, 3 Misc 3d 127(A)(App. Term 1st Dept. 2004).
In support of his case that he co-resided with Respondent's Mother during the requisite time period, Respondent submitted documentary evidence of the type that is probative toward primary residency connecting him to the subject premises from 2010 through December 31, 2014, including tax returns, Glenbriar Co., supra, 5 NY3d at 392-393, Second 82nd Corp., supra, 146 AD3d at 696, Columbus Manor, LLC, supra, 63 Misc 3d at 143(A), DMV records, Glenbriar Co., supra, 5 NY3d at 392-393, 300 East 34th St. Co., supra, 248 AD2d at 55, Columbus Manor, LLC, supra, 63 Misc 3d at 143(A), voter registration, Glenbriar Co., supra, 5 NY3d at 392-393, Brg 321 LLC, supra, 52 Misc 3d at 131(A), 300 East 34th St. Co., supra, 248 AD2d at 55, Brg 321 LLC, supra, 52 Misc 3d at 131(A), documents related to institutions of higher education, St Owner LP v. Doe, 26 Misc 3d 198, 200 (Civ. Ct. NY Co. 2009), statements of investment [*21]accounts, 542 E. 14th St. LLC v. Lee, 66 AD3d 18, 22-23 (1st Dept. 2009), 710 Madison Ave. LLC v. Hicks, 56 Misc 3d 131(A)(App. Term 1st Dept. 2017), police reports, going back to Respondent's arrest on April 20, 2010, Norfolk Dev. LLC v. Kee, 47 Misc 3d 150(A)(App. Term 1st Dept. 2015), and letters from collection agents, going back to January of 2010. 611 E. 179th St. Realty Corp. v. Gonzalez, 55 Misc 3d 1225(A)(Civ. Ct. Bronx Co. 2017).
Respondent also showed documentation from HRA using the subject premises as his address. As New York State regulations require HRA to verify beneficiaries' residences, 18 N.Y.C.R.R. §351.2(b), HRA's use of the subject premises as Respondent's address is probative as to his primary residence. Similarly, documentation from DOC shows the subject premises as Respondent's address. Lastly, Respondent showed the Court a letter mailed to him at the subject premises from DOE.
In further support of Respondent's case, Respondent submitted testimony from six non-party witness, ranging in affinity to Respondent from Tenant, his stepfather, to family friends like Former Roommate, to personal friends like Respondent's Friend and Respondent's Other Friend, to witnesses with no discernible interest in the outcome of this proceeding, like the Super and the Doorman. Witnesses with such a range of connections to a resident are persuasive in establishing primary residence. 170 Spring St. LLC v. Doe, 61 Misc 3d 1222(A)(Civ. Ct. NY Co. 2018). The testimony of these non-party witnesses consistently place Respondent at the subject premises from 2010 through December 31, 2014 when he was not incarcerated, not only to his regular presence at the subject premises, but also to the maintenance of Respondent's personal property in one discrete bedroom.
Petitioner argues that Respondent's testimony was not credible, in part because of his criminal convictions. Even if the Court were to attach zero weight to Respondent's testimony, whether for his convictions or because he is an interested party, the preponderance of the documentary evidence and non-party witness testimony shows that Respondent maintained the subject premises as his primary residence from at least some time in 2010 through December 31, 2014, more than the two years before the passing of Respondent's Mother necessary to establish succession.
Petitioner argues that Respondent's two incarcerations, totaling about three years and ten months and occurring intermittently within the five years before Respondent's Mother passed, toll the co-residency period, such that Respondent must prove his co-residency with Respondent's Mother back to March 8, 2009, more than five years and nine months before she passed. However, the two-year period co-residency period "shall not be deemed to be interrupted" by, inter alia, incarceration. 9 N.Y.C.R.R. §2523.5(b)(3)(iii).[FN3]
The very "toll" that Petitioner urges the Court to apply to Respondent is the functional equivalent of the "interruption" that the regulation proscribes. "[A] toll is simply an interruption of the running of the period of limitation." B. v. H., 86 AD2d 659, 660 (2nd Dept.), rev'd on other grounds, 57 NY2d 427 (1982). See Also Licitra v. Coughlin, 61 NY2d 450, 453 (1984)(a sentence that a convicted defendant had to serve was "interrupted" when an appellate ruling freed him, through [*22]the date a subsequent appellate ruling reinstated his sentence, an interval also likened to a "toll[]....")
Regulations are generally subject to same canons of construction as statutes. ATM One, LLC v. Landaverde, 2 NY3d 472, 477 (2004), Matter of Cty. of Oneida v. Zucker, 147 AD3d 1338 (4th Dept. 2017). The Court must construe a statute so as to give effect to every word therein to the extent possible, Matter of Mestecky v. City of NY, 30 NY3d 239, 243 (2017). The construction of the regulation that Petitioner urges would impermissibly not give effect to its language that an excused absence "shall" not "interrupt" the co-residency period. Furthermore, a period of co-residency of two years (or one year if the successor is disabled or elderly) is not a long time, and foreseeably shorter than the time it could to be a full-time student or to serve in the military, two of the absences that the regulation expressly deems excusable. A restrictive application of excusable absences is not consistent with the timeframes set forth in the regulation.
Legal authority that permits an inquiry into an occupant's pre-absence residence does not compel a different conclusion. Indeed, the Court above considered evidence that pre-dated December 31, 2012 to adjudicate the bona fides of Respondent's residency at the subject premises. But contrary case law concerns facts that are distinguishable from this case. For example, in 315 E. 72nd St. Owners, Inc. v. Siegel, 22 Misc 3d 10, 12-13 (App. Term 1st Dept. 2008), cited by Petitioner, the occupant never effectively co-resided with a tenant. Here, the preponderance of the evidence shows that Respondent co-resided with Respondent's Mother before his first incarceration, in between his first and second incarcerations, and after his second incarceration. Similarly, the facts in City Realty Associates Limited, supra, also cited by Petitioner, reveal an occupant who before incarceration used a different address than the tenancy he was trying to succeed to, had no customary indicia linking him to the tenancy he was trying to succeed to, and had an address with DOC for his release that was also not the tenancy he was trying to succeed to. In this matter, Respondent used the subject premises as his address going back to 2010, before his first incarceration, demonstrated the customary indicia linking him with the subject premises, and DOC used the subject premises as his address upon his release.
Significantly, in this very matter, the Appellate Term did not permit Petitioner discovery going back to March of 2009, the date that Petitioner contends that Respondent must prove co-residency from. 86 W. Corp. v. Singh, 57 Misc 3d 152(A)(App. Term 1st Dept. 2017). Rather, the Appellate Term permitted discovery back to September 5, 2010. Id. The Appellate Term further specified that September 5, 2010 was "a date that will enable petitioner to effectively ascertain whether [R]espondent primarily resided in the subject [premises] with [Respondent's Mother] not only for the two-year period prior to her death on or about January 2015, but also prior to [R]espondent's incarceration, the latter being of critical importance in assessing the bona fides of [R]espondent's succession defense." Id. Accordingly, the purpose of reviewing Respondent's records before December 31, 2012 is to determine his connection to the subject premises before his incarceration, not because his incarceration tolled the required time to co-reside with Respondent's Mother.
Petitioner also argues that Respondent cannot succeed to the tenancy of Respondent's Mother because he and Tenant engaged in fraud. As the Court found above, Tenant had permanently vacated before Respondent's Mother passed on December 31, 2014, but Tenant's name appeared on the Lead Paint Rider, dated January 1, 2015, and on two rent checks, dated September 2, 2014 and January 1, 2015. Respondent mailed Petitioner on January 21, 2015, [*23]stating that he lived with Tenant.
Under some circumstances, a delay in notification or a concealment of the vacatur of a tenant vitiates a succession claim. A critical, if not determinative, factor is the length of time in between a tenant's absence and a landlord's knowledge that the tenant moved out, with protracted periods of time being held to prejudice the landlord's ability to investigate a succession claim. 525 W. End Corp. v. Ringelheim, 43 Misc 3d 14, 15 (App. Term 1st Dept. 2014)(twenty years of concealment of the departure of the tenant prejudices a landlord), 366 W. 30th St., L.L.C. v. Avila, 57 Misc 3d 157(A)(App. Term 1st Dept. 2017)(sixteen years), 206 W. 104th St. LLC v. Zapata, 45 Misc 3d 135(A)(App. Term 1st Dept. 2014)(approximately fifteen years), South Pierre Assocs. v. Mankowitz, 17 Misc 3d 53 (App. Term 1st Dept. 2007)(thirteen years), Well Done Realty, LLC v. Epps, 58 Misc 3d 160(A)(App. Term 1st Dept. 2018)(twelve years), Extell Belnord LLC v. Eldridge, 42 Misc 3d 143(A)(App. Term 1st Dept. 2014)(eleven years), E. 96th St. Co., LLC v. Santos, 13 Misc 3d 133(A)(App. Term 1st Dept. 2006)(nine years), Third Lenox Terrace Assoc. v. Edwards, 91 AD3d 532 (1st Dept. 2012), Mia Terra Realty Corp. v. Sloan, 57 Misc 3d 141(A)(App. Term 1st Dept. 2017)(eight years), BCD Delancey LLC v. Jian Gou Lin, 42 Misc 3d 132(A)(App. Term 1st Dept. 2013)(seven years), PS 157 Lofts LLC v. Austin, 42 Misc 3d 132(A)(App. Term 1st Dept. 2013)(six years). Conversely, brief periods of concealment of the departure of a tenant of record, such as fifteen months, do not prejudice a landlord's ability to investigate a succession claim. 354 E. 66th St. Realty Corp. v. Curry, 26 Misc 3d 130(A)(App. Term 1st Dept. 2010).
The previous Rent-Stabilized tenant, Respondent's Mother, did not permanently vacate until December 31, 2014 by operation of her passing. The earliest that Petitioner could be subject to actionable fraud about a permanent vacatur, then, would be January of 2015, which is when Respondent concealed from Petitioner that Tenant had permanently vacated. Petitioner's predicate notice, dated June 11, 2015, stated that it was not renewing Tenant's lease because Tenant lived in the other address and Respondent lived in the subject premises. If there was deception or concealment, it lasted less than six months at best and clearly did not impinge on Petitioner's knowledge of Respondent's and Tenant's whereabouts.
Moreover, the renewal lease in effect at the time did not expire until October 31, 2015. Petitioner would not have had an occasion to even offer a renewal lease until 150 days to 90 days before October 31, 2015, or June 3, 2015 to August 2, 2015. 9 N.Y.C.R.R. §2523.5(a). It is the very renewal lease offer for a prior tenant that triggers the expectation that a remaining family member will inform a landlord of their status as a successor. 245 Realty Assocs. v. Sussis, 243 AD2d 29, 32-33 (1st Dept. 1998). Petitioner's evident knowledge of the true facts by the service of a notice pursuant to 9 N.Y.C.R.R. §2524.2(c)(2) in lieu of a lease renewal lease, the earliest time that Petitioner could have lawfully acted on those facts, demonstrates that whatever Respondent may have concealed did not prejudice Petitioner.
Furthermore, Petitioner did not rebut Respondent's testimony that he attempted to pay rent in Respondent's name and that Petitioner would not accept the rent. When a remaining family member uses the tenant's name on a lease or a rent payment after a landlord disregards an entreaty from the remaining family member, the landlord cannot claim actionable deception. 178 E. 70th St. LLC v. Woodward, 66 Misc 3d 151(A)(App. Term 1st Dept. 2020).
Finally, it bears noting that the statutory redefinition of "permanent vacatur" by the 2023 amendment to Public Housing Law §14(4)(a), 9 N.Y.C.R.R. §2523.5(b)(2), which applied to all pending proceedings on and after its enactment, 2023 NY ALS 760, 2023 NY Laws 760, 2023 [*24]NY Ch. 760, 2023 NY SB 2980, undermines a theoretical underpinning of the appellate authority that Petitioner's argument relies upon, particularly to the extent that Tenant's payment of rent after Respondent's Mother passed did not extend the date he permanently vacated. But be that as it may, for the reasons stated, Petitioner's argument does not prevail even under the old standard.
Accordingly, it is
ORDERED that Respondent has proven his succession defense, and it is further
ORDERED that Respondent is therefore not a licensee whose license has been terminated, and it is further
ORDERED that the Court dismisses this proceeding with prejudice.[FN4]

This constitutes the decision and order of this Court.
Dated: January 28, 2026
New York, New York
HON. JACK STOLLER, J.H.C.

Footnotes

Footnote 1:At Respondent's request, the parties and the Court agreed to refer to Respondent with an alias.

Footnote 2:Butler, supra, concerns tenants in common who are titleholders, not leaseholders. However, propositions related to tenants in common also apply to leaseholders. See, e.g., Rosenthal v. Mahler, 141 AD2d 625, 628 (2nd Dept. 1988).

Footnote 3:The actual language of the regulation forgives absences due to "a court order", which encompasses incarceration. See Kelly Mgt. LLC v. Soltero, 27 Misc 3d 984, 985-986 (Civ. Ct. Bronx Co. 2010), citing 1665-75 Bryant Ave. Redevelopment Assocs., LP v. Montgomery, N.Y.L.J., Feb. 24, 1998, at 25:3 (App. Term, 1st Dept.).

Footnote 4:Respondent counterclaimed for attorneys' fees, which Respondent asked for in his post-trial submission. Given that this case has already gone up to the Appellate Term twice, it seems likely that an appeal will again ensue. The Court prefers to wait until the completion of appeals before adjudicating attorneys' fees to avoid duplicative efforts. As counsel throughout this litigation have brought an admirably high level of practice to this case, including professionalism and courtesy to one another throughout, the Court would importune upon counsel to communicate with one another about steps going forward. If the parties wish to restore this matter for that purpose or other purposes by stipulation, that is fine. If Respondent cannot get an agreement and wishes to restore this matter, he may move for that relief.